Buddy **ROBINSON**, Appellant,

v.

**SURETY INSURANCE COMPANY OF CALIFORNIA, Jo Nell Thornton and Harry Meetze, Appellees.**

No. 2–84–112–CV.

Court of Appeals of Texas, Fort Worth.

April 24, 1985.

Lollar & Phillips, and Philip D. Phillips, Fort Worth, for appellant.

Vial, Hamilton, Koch & Knox, and Robert M. Hoffman, Attys. for Surety Ins. Co. of California, Dallas, Brantley Pringle, Atty. for Jo Nell Thornton & Harry Meetze, Fort Worth, for appellees.

FENDER, C.J., and BURDOCK, J.

## OPINION

FENDER, Chief Justice.

This case involves an interpretation of a guaranty agreement. In three points of error, appellant Buddy Robinson (the guarantor), contends that the trial court erred in interpreting the guaranty agreement.

In a fourth point of error, appellant claims that the trial court erred in awarding attorney's fees to appellees.

We reform and affirm in part and reverse and render in part.

The case arises out of the sale of leasehold interests in, and the physical assets of, the Clover Club, a night club located in Fort Worth. The Clover Club was and is owned by Odell Allen. On December 3rd, 1979, Odell Allen gave a leasehold interest in the club to Jo Nell Thornton and Harry Meetze, husband and wife. To operate the bar, Thornton and Meetze needed a mixed beverage permit from the Texas Alcoholic Beverage Commission, (TABC) and to get such a permit, it was required that Thornton and Meetze have a surety to guarantee their payment of fees, taxes and penalties to the TABC in case of default. Accordingly, Thornton and Meetze entered into two surety agreements with Surety Insurance Company of California, one of the appellees (Surety). Two surety agreements were signed, one in 1979 and one in 1981. The agreements provided that Thornton and Meetze would indemnify Surety if Surety was ever called upon to make a payment on its surety bond to TABC.

In January, 1981, Meetze sold his one-half leasehold interest in the Clover Club to a third party. In February, 1981, this third party sold his one-half leasehold interest in the Clover Club to W.H. "Skip" Caywood. On April 8, 1981, Thornton, as seller, Caywood as purchaser, and appellant, as guarantor, entered into a written agreement which provided for the sale of Thornton's one-half interest in the Clover Club to Caywood. Under this April 8th agreement Caywood agreed (1) to pay Thornton $10,-200 in weekly installments of $250; (2) to pay all of the unpaid accounts payable owed by the Clover Club; and (3) to pay the unpaid portion of the third party's debt to Meetze. The agreement also provided that appellant would guarantee Caywood's payment of the purchase price. This guaranty was limited to the amount of the gross income collected from amusement machines which appellant had had in the Clo-

ver Club when it was operated by Thornton and Meetze and which he agreed to keep in operation under Caywood.

Appellant's first three points of error relate to the scope of his guaranty under the April 8th agreement. Before we examine the agreement, we recount the background which brought Surety into this lawsuit. An audit conducted by the TABC covering the period January 4, 1980, to May 26, 1981, disclosed that the Clover Club owed approximately $14,000 in back taxes. When demand upon the Clover Club proved unsuccessful, the TABC made demand upon Surety. Surety paid the delinquency. Surety then intervened in a breach of contract action based on the April 8th agreement which Thornton and Meetze had brought against Caywood and Robinson. Surety contended that Thornton, Meetze, Caywood and appellant were all liable to it for the $14,418 it had paid the TABC. It argued that Thornton and Meetze were liable because under the surety agreements of 1979 and 1981 they had agreed to indemnify Surety; that Caywood was liable because under the April 8 purchase agreement he had agreed to pay all accounts payable of the Clover Club; and that appellant was liable because under the April 8 agreement he had agreed to guarantee all of Caywood's obligations.

The case was tried to the court without a jury. Caywood failed to appear. The judgment in effect made Surety the primary judgment creditor and authorized it to collect the first $14,019.39 recovered from any of the judgment debtors. (In essence, this allowed Surety to garnish the debts which Caywood and appellant owed to Thornton and Meetze). Thornton and Meetze also got a judgment against Caywood for $36,-122.66 based on the underlying contract action, and they also got a judgment against appellant for $9,232.00, the amount the court found to be the gross income of appellant arising from the operation of his machines in the Clover Club. Finally, Surety was awarded attorney's fees of $5,163.00 against Caywood, Thornton, Meetze and appellant, and Thornton and

Meetze were awarded attorney's fees of $5,000.00 against Caywood and appellant.

In point of error number one, appellant claims that the trial court erred in interpreting the April 8th agreement to mean that appellant was liable for the discharge of all accounts payable and debts of the Clover Club. Appellant also argues that the trial court erred in ruling that appellant is obligated by this guarantee to pay Surety $14,019.00. Appellant urges that the guarantee only applied to Caywood's promise to pay Thornton $10,200.00.

Appellant's argument under this point of error reflects that he has misread a significant aspect of the judgment. While the judgment does hold that the scope of appellant's guaranty included Caywood's promise to assume the accounts payable and debts of the Clover Club (which would include taxes), the judgment nonetheless limits appellant's liability under the guarantee to $9,232, the gross income received by the amusement machines. The judgment does not obligate appellant to pay Surety $14,019.00.

Although the appellant has misread the judgment to mean that he was obligated to pay Surety $14,019, appellant's contention that the trial court erred in finding that his guaranty included accounts payable does have the following monetary significance. It is undisputed by both appellant and Surety that (1) Caywood owes a balance of $8,900 on his promise to pay Thornton $10,200, and (2) appellant's guaranty, regardless of whether it includes accounts payable, applies to this $8,900 balance. Considering the judgment in light of this undisputed $8,900 figure, the only way to justify the $9,232 liability adjudged against appellant is to reason that it is composed from (1) the $8,900 balance and (2) $332 from the approximately $14,000 liability based on accounts payable tacked on to reach the $9,232 liability ceiling.

Thus, as we read appellant's first point of error, the judgment of $9,232 is in error in the amount of $332, the amount tacked on as a result of appellant's liability for accounts payable. Consequently, whether the trial court erred in holding that appellant's guaranty included the discharge of accounts payable has significance, not in the amount of $14,019, but only in the amount of $332.

Although the impact of the alleged error is not as great as argued by appellant, we nonetheless agree with the appellant that the trial court did err in holding that the guaranty included accounts payable.

■ We first note that a guaranty agreement is to be strictly construed and may not be extended beyond its precise terms by construction or implication. *Reece v. First State Bank of Denton*, 566 S.W.2d 296 (Tex.1978); *McKnight v. Virginia Mirror Company*, 463 S.W.2d 428 (Tex.1971). Bearing this rule of construction in mind, we now examine the agreement.

■ The agreement is contained in three pages. It contains a preamble composed of seven recitals and a body composed of ten paragraphs. There is no question that the agreement fails to contain any explicit promise on the part of appellant to guarantee Caywood's obligation to pay accounts payable (which would include taxes). Instead, the agreement contains the following expressions relevant to appellant's guaranty:

"Whereas, W.H. Caywood desires to purchase Jo Nell Thornton's interest in the Clover Club for a purchase price of $10,200.00, payable at the rate of $250.00 per week;

.    .    .    .    .

"Whereas, Buddy Robinson ... is willing to guarantee payment by W.H. Caywood of the note and debt owing to Jo Nell Thornton ...

II

"The Purchaser, W.H. Caywood, hereby promises and agrees to pay to Jo Nell Thornton as the agreed value of her one-half interest in the Clover Club, the sum of $10,200.00. Such purchase price shall be payable ...

### III

"Purchaser, W.H. Caywood, hereby promises and agrees that he will pay all of the unpaid accounts payable owed by the Clover Club, ...

### IV

"W.H. Caywood hereby promises and agrees, and assumes to pay, the unpaid portion of the purchase contract and debt heretofore owed by Billy W. Smith to Harry E. Meetze for his one-half interest in the Clover Club....

.    .    .    .    .

### VI

"Buddy Robinson further hereby promises and agrees to pay to Jo Nell Thornton all of the coin income and revenue on such amusement coin machines at the Clover Club as a credit on the purchase price owing by W.H. Caywood to Jo Nell Thornton until such purchase price is paid in full, and Buddy Robinson hereby guarantees the payment by W.H. Caywood to Jo Nell Thornton of the purchase price for her interest in the Clover Club up to the amount of the gross income of the amusement coin machines....

### VII

"However, the guaranty agreement of Buddy Robinson, as Guarantor, is limited to payment by Buddy Robinson to Jo Nell Thornton all [sic] of the gross income of the coin amusement machines located at the Clover Club from the date of this contract, and until the purchase price to Jo Nell Thornton, with interest, is paid in full."

Surety argues that a reading of paragraph VI in conjunction with paragraph III indicates that appellant's guaranty of the purchase price included Caywood's obligation to Thornton to discharge the unpaid alcohol taxes.

We disagree. We base our decision on a construction of the two-word phrase "purchase price," found in paragraph VI. To ascribe to this phrase a global meaning, so that it includes not only the $10,200 note, but also accounts payable, conflicts with the rule of construction announced in *Reece* and *McKnight* that a guaranty agreement must be strictly construed and may not be extended beyond its precise terms. In this regard, it is significant that Caywood's obligations to Thornton were set forth in three separate paragraphs (paragraphs II, III and IV). While the obligation set forth in paragraph II (the $10,200 note) is described as "such purchase price," the obligations set forth in paragraph III (accounts payable) and paragraph IV (unpaid debt to third party) are not described as such. Thus, while the paragraph II obligation is explicitly linked to the phrase "purchase price," the obligations in paragraphs III and IV are not. The absence of such explicit links convinces us that appellant's promise in paragraph VI to guarantee Caywood's payment of the "purchase price" to Thornton extends only to the $10,200 note. Thus, the trial court was wrong when he held that appellant's guaranty included accounts payable and the judgment should be reformed to find that appellant is only liable for $8,900.

■ Appellant's second point of error has to do with another aspect of the scope of his guaranty. In paragraph VI, the agreement states that "Buddy Robinson hereby guarantees the payment by W.H. Caywood to Jo Nell Thornton of the purchase price for her interest in the Clover Club up to the amount of the gross income of the amusement coin machines in the Clover Club." Appellant contends that the trial court erred in finding that the sum of $9,232, which was the total amount of money collected by the machines, was the "gross income." Appellant urges that the trial court should have construed the "gross income" to mean one-half of the total amount of money collected by the machines.

■ Appellant offers the following rationales to support his argument. First, appellant urges that the term "gross income" is inherently ambiguous, so that the

trier of fact (in this case the court) should rely on extrinsic evidence to construe it. The question of whether a contract is ambiguous is one of law for the court. *See City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518, (Tex.1968). The test of whether a written instrument is ambiguous is whether it is so worded that a court may properly give it a certain or definite legal meaning or interpretation. *Commercial Union Insurance Co. v. Martinez*, 635 S.W.2d 611, 613 (Tex.App.—Dallas 1982, writ ref'd n.r.e.). Applying this test to the guaranty agreement, we hold that the term "gross income" is not ambiguous. Our reading of the agreement fails to disclose any language which might support the view that "gross income" means something other than the total amount of money collected by the machines. Although appellant notes that the definition of "gross income" contained in two different dictionaries and a 1040 tax form differ slightly from each other, that observation fails to convince us that the term is ambiguous. We hold that it is not.

Appellant also notes that Thornton testified at trial that in her understanding of the agreement, appellant was liable on his guaranty only to the extent of one-half of the monies collected, and not to the total take. Appellant contends that this testimony either amounted to a "judicial confession," or established that Thornton and appellant had stipulated that the term "gross income" would mean one-half the take. We disagree. We first note that Surety did not object to this testimony, and thus, any error to its admission on the ground that extrinsic evidence should not be admitted to vary an unambiguous contract, was waived. Thus, given that the testimony was admitted into evidence, it might have some probative value. Nevertheless, we do not find any such probative value to be conclusive. Based on the unambiguous nature of the agreement, the trial court's construction of "gross income" was not error.

In his last argument under this point of error, appellant contends the evidence introduced at trial established that there had been an oral modification of the agreement. We have examined the record and find no evidence of a modification. Appellant's second point of error is overruled.

■ In his third point of error appellant argues that the guaranty agreement expired when the operation of the Clover Club changed hands in October, 1981. The Clover Club, as operated by Caywood, closed October 7, 1981. In December, 1981, the New Clover Club opened with different operators, who allowed appellant to continue to operate his machines.

We disagree that appellant's post-default income should be insulated from claims based on the guaranty agreement. There is no provision in the agreement terminating appellant's guaranty upon Caywood's default. On the contrary paragraph VI states that "Buddy Robinson hereby guarantees the payment by W.H. Caywood ... until the purchase price owing to Jo Nell Thornton, including accrued interest, is paid in full." Furthermore, the testimony at trial established that the conditions under which appellant operated the machines in the club after Caywood left were nearly identical to the previous conditions. Appellant has not shown that he was harmed by the change. Appellant's third point of error is overruled.

In regards to appellant's second and third points of error, it should be noted that appellant never pled nor argued for a reformation of the contract based on a mistake in the written contract. In our view of the situation, a defense predicated on such a theory would have had a greater chance of success. It is perhaps not coincidental in this regard that appellant drafted his own answer (a general denial) and represented himself at trial pro se. While appellant was entitled to represent himself pro se, he is certainly not entitled to special treatment, and that he has perhaps foregone a viable defense because of his ignorance of the law is a consequence he must bear.

In his fourth point of error, appellant attacks the following two separate awards of attorney fees rendered against him: (1)

an award of $5,163.00 for Surety's attorney fees rendered against Caywood, Thornton, Meetze and appellant, and (2) an award of $5,000 for Thornton's and Meetze's attorney fees rendered against Caywood and appellant. Appellant contends that a guarantor will only be liable for attorney fees in his capacity as a guarantor when he has expressly agreed to pay attorney fees. *See Blume v. National Homes Corp.*, 441 S.W.2d 176 (Tex.1969); *Ganda, Inc. v. All Plastics Molding, Inc.*, 521 S.W.2d 940 (Tex.App.—Waco 1975, writ ref'd n.r.e.). Since appellant did not expressly agree in the April 8th agreement to pay attorney fees, appellant urges he should not be liable for them.

■ Although we reject appellant's underlying rationale, we hold for independent reasons that the award to Thornton and Meetze was proper while the award to Surety was not. First, we find that it is no longer necessary that a guarantor expressly agree to pay attorney fees. We base this conclusion on the fact that in 1977, TEX.REV.CIV.STAT.ANN. art. 2226 (Vernon Supp.1985) was amended to provide for attorney fees in "suits founded on oral or written contracts." Because this amendment expressly broadened the applicability of art. 2226, we hold that it overruled the common law rule set forth in *Blume*, which was based on the pre-1977 statute. We hold therefore that in a suit brought against a guarantor "founded on oral or written contracts," a guarantor is liable for attorney fees even if he did not expressly agree to pay them.

■ With that preface in mind, we now examine the two awards of attorney fees at issue here. In regards to the award in favor of Thornton and Meetze, there is no question that Thornton's and Meetze's action against appellant was predicated upon the April 8th agreement. Significantly, both Thornton and appellant were signatories to that contract, and thus they were in contractual privity. Consequently, we overrule appellant's point of error in regards to the $5,000 award of attorney fees to Thornton and Meetze. In doing so, we note that, at least in theory, Thornton should have presented evidence showing an apportionment of her attorney fees to reflect those costs attributable to (1) her claim against Caywood; (2) her claim against appellant; and (3) Meetze's claims against Caywood and Appellant. (Although Meetze was not a signatory to the April 8th agreement, the agreement nevertheless provided that Caywood would pay off the unpaid portion of the purchase price which Meetze owed to the third party. Thornton and Meetze were represented by the same attorney). *See Harmes v. Arklatex Corp.*, 615 S.W.2d 177, 180 (Tex.1981). However, since Caywood did not appear at trial, and since appellant did not raise this point himself, we hold that any error presented by the absence of an allocation has been waived.

■ We cannot find, however, that Surety's position in this lawsuit is one which entitled it to the relief under art. 2226. Specifically, we do not find that Surety's claim against appellant is one founded on an oral or written contract, as required by art. 2226. Significantly, Surety has never been in contractual privity with appellant. *See Trinity Universal Ins. Co. v. Drake*, 587 S.W.2d 458, 462 (Tex.Civ.App.—Dallas 1979) *aff'd in part and reversed in part*, 600 S.W.2d 768 (Tex.1980). Although Surety relies on the April 8th agreement as the ultimate basis for its claim against appellant, in the absence of contractual privity between Surety and appellant, Surety's suit cannot be said to be founded on the April 8th agreement. Therefore, the judgment against appellant for Surety's attorney fees in the amount of $5,163 was improper and should be reversed.

The judgment below is reformed and affirmed in part and reversed and rendered in part. Appellant is not liable for accounts payable, and thus the judgment against him is reduced from $9,232 to $8,900. Furthermore, while appellant is not liable for Surety's attorney fees, he is liable for Thornton's and Meetze's attorney fees. Costs of appeal are to be charged one-half

to appellant and one-half to Surety, Thornton and Meetze.